UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH AND LYNETTE DAIRY, *et al.*, | No. C-13-1518 EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| CHARLTON BONHAM, Director of the California Department of Fish and Wildlife, in his official capacity, | **(Docket No. 67)** |
| Defendant. | |
| _____/ | |

Plaintiffs are a six individuals and a limited liability company involved in commercial Dungeness crab fishing, who have sued to invalidate California Fish & Game Code § 8276.5 (Dungeness Crab Trap Limit Program regulations), seeking declaratory and injunctive relief for various alleged federal constitutional violations. Currently pending before the Court is the Government's Motion for Summary Judgment, or, alternatively, Summary Adjudication as to Plaintiffs' (1) Fourth Claim (Privileges and Immunities); and (2) Eighth Claim (Magnuson-Stevens Act). Docket No. 67

Having considered the parties' briefs and accompanying submissions, as well as the argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendant's motion for summary judgment.

///

///

///

## I.  FACTUAL & PROCEDURAL BACKGROUND

A. Federal Regulation of Dungeness Crab

In 1976, Congress enacted the Magnuson-Stevens Fishery Conservation Management Act ("Magnuson-Stevens Act"), 16 U.S.C. § 1801 et seq., "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1). To effectuate these and other goals, the United States asserted "sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone." *Id.* at § 1811(a). Despite asserting this broad authority, the Magnuson-Stevens Act expressly preserves state authority over fishery resources within its boundaries and outside its boundaries under certain circumstances:

> (a) In general
>
> > (1) Except as provided in subsection (b) of this section, nothing in this chapter shall be construed as ***extending or diminishing*** the jurisdiction or authority of any State ***within its boundaries***. . .
> >
> > (3) A State may regulate a fishing vessel ***outside the boundaries of the State*** in the following circumstances:
> >
> > > (A) The fishing vessel is ***registered under the law of that State***, and (I) there is ***no fishery management plan*** or other applicable Federal fishing regulations for the fishery in which the vessel is operating; or (ii) the State's laws and regulations are consistent with the fishery management plan and applicable Federal fishing regulations for the fishery in which the vessel is operating.

16 U.S.C. 1856 (Oct. 11, 1996) (emphasis added). Thus, under the Magnuson-Stevens Act, California could regulate (1) within its boundaries, and (2) outside its boundaries, if (a) the vessel is a California-registered fishing vessel, and (b) no fishery management plan is in place. It is undisputed that there is still no fishery management plan in place.

However, the Magnuson-Stevens Act did not permit California and other states to regulate out-of-state registered fishing vessels in adjacent federal waters. *See* H.R. Rep. No. 105-674, 105 th Cong., 2d Sess. (1998). Such waters are referred to as the EEZ, or exclusive economic zone. The

2

"EEZ," or the "exclusive economic zone" is effectively federal oceanic waters over which the United States proclaimed exclusive jurisdiction in Presidential Proclamation 5030 of March 10, 1983. *See* Calif. Pub. Resources Code § 71520. It begins where California waters end – three nautical miles from shore–until 200 nautical miles off shore. *See* http://resources.ca.gov/ocean/html/chapt_3.html (last visited December 9, 2013).

In 1996, Congress enacted the Dungeness Crab Act, codified at section 112(d) of P.L. 104-297 (16 U.S.C. 1658 note) (Oct. 11, 1996). Under the Dungeness Crab Act, California, Oregon, and Washington were authorized to enforce their regulations against any vessel operating within the EEZ, subject to certain limitations. The Dungeness Crab Act provides in relevant part:

> (a) In General. Subject to the provisions of this section and notwithstanding section 306(a) of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. § 1856(a)), each of the States of Washington, Oregon, and California ***may adopt and enforce State laws and regulations governing fishing and processing in the exclusive economic zone adjacent to that State*** in any Dungeness crab (Cancer magister) fishery for which there is no fishery management plan in effect under that Act.
>
> (b) Requirements for State Management. Any law or regulation adopted by a State under this section for a Dungeness crab fishery –
>
> > (1) except as provided in paragraph (2), ***shall apply equally*** to vessels engaged in the fishery in the exclusive economic zone and vessels engaged in the fishery in the waters of the State, and ***without regard to the State that issued the permit under which a vessel is operating***;
>
> (c) Limitation on Enforcement of State Limited Access Systems. Any law of the State of Washington, Oregon, or California that establishes or implements a limited access system for a Dungeness crab fishery ***may not be enforced against a vessel*** that is ***otherwise legally fishing*** in the exclusive economic zone adjacent to that State ***and that is not registered under the laws of that State***, except a law regulating landings.

P.L. 104–297 (16 U.S.C. 1856 note) (Oct. 11, 1996) (emphasis added). The Dungeness Crab Act has been reauthorized and amended in 1998, see P.L. 105-384, § 203 (16 U.S.C. § 1856 note) (Nov. 13, 1998), and again in 2007, see P.L. 109-479, § 302(e) (16 U.S.C. § 1856 note) (Jan. 12, 2007). Since January 1, 2007, pursuant to Fish & Game Code section 8280.9 and the Tri-State E-200 Agreement of 2007, California-permitted Dungeness crab vessels are the only vessels authorized to

3

fish for Dungeness crab in the EEZ adjacent to California.  *See Marble v. Dept. of Fish and Wildlife*, 234 P.3d 1062, 1072 (Or. App. 2010).

B.      California's Dungeness Crab Trap Limit Program

In 2011, the California legislature enacted the Dungeness Crab Trap Limit Program regulations, codified at Calif. Fish & Game Code § 8276.5 (hereinafter "Dungeness Crab Trap Limit Program regulations"). *Id*. at ¶ 1.  In relevant part, the statute provides that:

> (a) In consultation with the Dungeness crab task force . . . the director shall adopt a program, by March 31, 2013, for Dungeness crab trap limits for all California permits.
>
> (1) The program shall contain seven tiers of Dungeness crab trap limits based on California landings receipts under California permits between November 15, 2003, and July 15, 2008.[1]

Calif. Fish & Game Code § 8276.5(a)(1).  Subdivision (a)(1) of the California's Dungeness Crab Trap Limit Program regulations provides that permitholders are to be assigned to a tiering scheme as follows:

| Tier | Total Allocable Permits | Maximum Trap Allocation |
|---|---|---|
| 1 | 55 | 500 |
| 2 | 55 | 450 |
| 3 | 55 | 400 |
| 4 | 55 | 350 |
| 5 | 55 | 300 |
| 6 | 170[2] | 250 |
| 7 | 124[3] | 175 |

---

[1] This time period is referred throughout as the "Qualifying Period."

[2] *See e.g.*, Docket No. 80 (Ex. B to Jackson Decl.) ("Notice of California Dungeness Crab Vessel Permit Trap Tier Allocation").

[3] *See id*.

1  Assignment to the various tiers depends entirely on the amount of crab landed in California, as
2  evidenced by landing receipts, within the Qualifying Period.  The regulations therefore do not
3  consider a vessel's landings history outside of California – *e.g.*, Oregon or Washington.

### C. Current Action

Plaintiffs are six individuals and one limited liability company who make a living in the tri-state Dungeness crab fishery – Oregon, California, and Washington.  *See* Docket No. 34 (FAC ¶¶ 1, 3).  Plaintiffs are not California residents.  *See* Docket No. 34 (FAC ¶ 3).  Rather, Plaintiffs allege they are nonresident Dungeness crab permitholders who fish Dungeness crab in California waters, or federal waters adjacent to California.  *Id*.  Plaintiffs allege they have lawfully landed crab outside of California during the Qualifying Period.  *Id*. at ¶¶ 9-13.  Because the statute does not count crab landed outside of California, Plaintiffs allege they have been assigned to lower tiers and as a consequence have been allocated lower numbers of Dungeness crab trap tags.  *Id*. at ¶ 3.  Plaintiffs do not dispute they are still permitted to fish for Dungeness crab in California.

On April 5, 2013, Plaintiffs filed the current lawsuit against the director of the California Department of Fish and Wildlife (the "Government"), challenging the Dungeness Crab Trap Limit Program regulations on various constitutional grounds.  *See* Docket No. 1.  The Government moved to dismiss certain claims of the FAC: first (Commerce Clause), second (Equal Protection Clause), third (Right to Free Movement), fourth (Privileges and Immunities Clause, as to plaintiff F/V Brooke Michelle only), fifth (Procedural Due Process), sixth (Bill of Attainder, all plaintiffs), seventh (Bill of Attainder, as to plaintiffs Dairy, Speer, and Moore only), and ninth claims (Declaratory Relief).  *See* Docket No. 21.  On July 23, 2013, this Court issued its order granting the motion as to all claims except Plaintiffs' ninth claim.  *See* Docket No. 46.  Only two substantive claims for relief remained: (1) Fourth Claim (Privileges and Immunities Clause); and (2) Eighth Claim (Magnuson-Stevens Act).

The Government now moves for summary judgment (or alternatively, summary adjudication) as to Plaintiffs' two remaining substantive claims.  *See* Docket No. 67.  Specifically, the Government requests the Court grant summary judgment as to Plaintiffs' (1) Fourth Claim (Privileges and Immunities), on grounds they fail as a matter of law—*i.e.*, the Dungeness Crab Trap

5

1 Limit Program regulations (a) do not facially distinguish residents from nonresidents, (b) do not
2 infringe upon a "privilege" protected under the Clause, and (c) were not enacted with a protectionist
3 purpose; and (2) Eighth Claim (Magnuson-Stevens Act), on grounds Plaintiffs cannot (a) meet their
4 burden of establishing preemption, or (b) overcome the presumption against preemption.

## II. DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

In the current case, the Government has moved for summary judgment on the two remaining claims: (1) Privileges and Immunities; and (2) Magnuson-Stevens Act. Because Plaintiffs have the ultimate burden of proof on each of these claims, the Government may prevail on its motion for summary judgment by pointing to Plaintiffs' failure "to make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Privileges and Immunities Clause

"Under the Privileges and Immunities Clause, '[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States.'" *McBurney v. Young*, 133 S. Ct. 1709, 1714 (2013) (citing U.S. Const., Art. IV, § 2, cl. 1). The United States Supreme Court has articulated the purpose of the Privileges and Immunities Clause is "'[to] constitute the citizens of the United States [as] one people,' by 'plac[ing] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are

concerned.'" *Id.* (quoting *Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 296 (1998)). "While the Clause forbids a State from *intentionally* giving its own citizens a competitive advantage in business or employment, the Clause does not require that a State tailor its every action to avoid any *incidental effect* on out-of-state tradesmen." *McBurney*, 133 S. Ct. at 1716 (emphasis added).

Ordinarily, to determine whether a statute's residency classification violates the Privileges and Immunities Clause, the Ninth Circuit employs a two-step inquiry:

> "First, we decide whether the activity in question is 'sufficiently basic to the livelihood of the nation ... as to fall within the purview of the Privileges and Immunities Clause.'"
>
> "Second, if the challenged restriction deprives nonresidents of a protected privilege, we will invalidate it only if we conclude that the restriction is not closely related to the advancement of a substantial state interest."

*Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008) (citing *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988)).

Additional analysis is required where the alleged discrimination is not facial. Although it is undisputed that the Dungeness Crab Trap Limit Program regulations do not facially discriminate between residents and nonresidents (*see* Docket No. 46 (Order, at pg. 5)), the "absence of an express statement in...laws and regulations identifying out-of-state citizenship as a basis for disparate treatment is not a sufficient basis for rejecting...[a privileges-and-immunities] claim." *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 67 (2003). The Supreme Court has implied, without deciding,[4] that the Privileges and Immunities Clause could apply to

> "classifications that are [1] but proxies for differential treatment against out-of-state residents, or [2] as prohibiting any classification with the *practical effect* of discriminating against such residents . . ."

*Hillside Dairy*, 539 U.S. at 67 (emphasis added). Additionally, to violate the Privileges and Immunities Clause a statute must have been enacted for a protectionist purpose. *See McBurney*, 133

---

[4] *See Chalker v. Birmingham & N. W. Ry. Co.*, 249 U.S. 522 (1919) (finding that despite not drawing a distinction on its face, statute imposing tax on those with out-of-state offices discriminated in practical effect: "Practically, therefore, the statute under consideration would produce discrimination against citizens of other states by imposing higher charges against them than citizens of Tennessee are required to pay.").

7

1  S. Ct. at 1715 (noting that "the Court has struck laws down as violating the privilege of pursuing a
2  common calling only when those laws were enacted for the *protectionist purpose* of burdening out-
3  of-state citizens" and upholding statute because it had a nonprotectionist aim) (emphasis added).
4  Accordingly, under the particular facts of this case, the Court must determine whether the statute at
5  issue here discriminates on the basis of residency in purpose and effect.

6  Accordingly, because the Dungeness Crab Trap Limit Program regulations do not expressly
7  discriminate against nonresidents, Plaintiffs have the burden of showing that the regulations
8  (1) implicate a "sufficiently basic" or fundamental privilege protected by the Clause to fall within its
9  purview; and (2) implicitly draw a discriminatory classification – *i.e.*, (a) proxy for differential
10 treatment, or (b) discrimination in practical effect. The discriminatory effect must be more than
11 incidental. *McBurney*, 133 S. Ct. at 1716. Further, Plaintiffs must show that the regulations evince
12 a protectionist purpose.

### 1. Fundamental Privilege

14 First, the Court addresses whether that the Dungeness Crab Trap Limit Program regulations
15 fall within the purview of the Privileges and Immunities Clause. "A nonresident's right to 'ply [a]
16 trade, practice [an] occupation, or pursue a common calling within the State' is a fundamental right
17 protected by the privileges and immunities clause." *Int'l Org. of Masters, Mates & Pilots v.*
18 *Andrews*, 831 F.2d 843, 845-46 (9th Cir. 1987) (quoting *Hicklin v. Orbeck*, 437 U.S. 518, 524
19 (1978)). The parties dispute whether the activity in question here – commercial Dungeness crab
20 fishing – falls within the purview of the Privileges and Immunities Clause. Plaintiffs contend that
21 the Dungeness Crab Trap Limit Program regulations implicate the fundamental right or privilege to
22 pursue a common calling.[5] The Government responds that the regulations do not fall within the

---

[5] Plaintiffs also allege that the Dungeness Crab Trap Limit Program regulation's California-landings-only rule violates the Privileges and Immunities Clause by impinging upon "the economic value of their California-issued permits." *See* Docket No. 34 (FAC, ¶ 60). The Government contends that the "economic value" of Plaintiffs' permits is not likely within the purview of the Clause. *See* Docket No. 67 (Mot., at pg. 11) (citing *McBurney*, 133 S. Ct. at 1715). This is not accurate. The right to dispose of property, like a permit, is a fundamental privilege of citizenship like the right to pursue a common calling. *McBurney*, 133 S. Ct. at 1716 ("Like the right to pursue a common calling, the right to 'take, hold and dispose of property, either real or personal,' has long been seen as one of the privileges of citizenship."). But this privilege is not implicated in this regard here because the Dungeness Crab Trap Limit Program regulations do not prohibit Plaintiffs from

purview of the Privileges and Immunities Clause because Plaintiffs cannot show they are "prevented or discouraged" by the State from pursuing their livelihood.

A statute need not effectuate a complete bar in order to implicate the Privileges and Immunities Clause. As the Supreme Court stated in *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 66-67 (1988), "Nothing in our precedents, moreover, supports the contention that the Privileges and Immunities Clause does not reach a State's discrimination against nonresidents when such discrimination does not result in their total exclusion from the State. . . The issue instead is whether the State has burdened the right to practice law." *See McBurney*, 133 S. Ct. at 1717 (finding requirement that nonresidents conduct internet search to obtain property records "did not impose *any significant burden* on noncitizens' ability to own or transfer property in Virginia.") (emphasis added). *Cf. Molasky-Arman*, 522 F.3d at 934 (finding statute "*deprives* licensed nonresident agents and brokers of this privilege by precluding them from finalizing insurance contracts without the countersignature of a resident agent, thereby satisfying the first step of our inquiry.") (emphasis added). Indeed, the Ninth Circuit in *Andrews*, cited approvingly by the Government, recognized that a statute implicates the Clause where it burdens the pursuit of a common calling by rendering it unprofitable. *Andrews*, 831 F.2d at 846 (citing *Toomer v. Witsell*, 334 U.S. 385 (1948)).

This is precisely what Plaintiffs contend here. Plaintiffs' sworn testimony states that they were accustomed to fishing Dungeness crab using in excess of 500 traps and are now limited to fishing with substantially fewer traps. *See* Docket No. 34 (FAC, ¶ 3) ("Historically, each of the Plaintiffs' vessels have fished at least 500 crab traps."); Docket Nos. 75 (Dairy Decl., ¶ 21) (noting that out-of-state landings of crab during the Qualifying Period exceeded 500,000 pounds, yet received an allocation of only 250 traps); 76 (Currie Decl., ¶ 76) (noting that out-of-state landings of crab during the Qualifying Period exceeded 1,000,000 pounds, yet received an allocation of only

---

selling their permits. *See id*. at 1716 (finding Virginia FOIA statute did fun afoul of the Privileges and Immunities Clause by abridging the fundamental right to "take, hold and dispose of property, either real or personal" because the statute did not prohibit appellants from obtaining documents that are necessary to transfer property – *e.g.*, title documents and mortgage records). Plaintiffs cite no authority to show that a reduction in property value is sufficient to bring a statute within the Clause's purview.

1  450 traps); 77 (Moore Decl., ¶ 13) (noting that out-of-state landings of crab during the Qualifying
2  Period exceeded 640,000 pounds, yet received an allocation of only 175 traps); 78 (Speir Decl., ¶ 16,
3  Ex. A) (noting that out-of-state landings of crab during the Qualifying Period exceeded 185,924
4  pounds, yet received an allocation of only 300 traps). Plaintiffs contend this has substantially
5  burdened their ability to earn a livelihood in their crab fishing industry. They contend the regulators
6  have made crab fishing unprofitable. *See* Docket No. 72 (Opp'n, at pg. 15); FAC, ¶ 20). *Cf.*
7  *Andrews*, 831 F.2d at 846 (noting statute did not "make employment with AMHS unprofitable for
8  nonresidents").

### 2. Discriminatory Effect

10 Second, the Court addresses whether the Dungeness Crab Trap Limit Program regulations
11 discriminate in effect against nonresident crab fishermen. Although the regulations do not involve
12 an outright ban or exclusion of nonresidents, they do have a concrete limiting effect. Unlike the
13 licensing fee differential at issue in *Marilley v. Bonham*, No. C-11-02418 DMR, 2013 WL 5745342,
14 *12 (N.D. Cal. Oct. 16, 2013) (granting summary judgment on plaintiffs' privileges-and-immunities
15 claim involving license fee disparities charged to resident vis-à-vis nonresident Dungeness crab
16 fishermen) which imposes a financial disincentive, the regulations here impose a numerical limit on
17 crab traps based on historical data that is unchangeable.

18 While qualitatively more harsh than a licensing fee disparity, the Court must examine the
19 magnitude of the disparity as between residents and nonresidents in assessing the burden on
20 nonresidents. The parties dispute the degree of disparate impact between residents and nonresidents.
21 The Government contends that nonresidents are in fact over-represented in the highest tier, thus
22 demonstrating there is no adverse discriminatory impact on nonresidents. Specifically, publicly
23 available statistics show "nonresidents are "over-represented" in the top tier – comprising 14.5% of
24 tier one permitholders but only 12.8%, on average, of those holding permits during the qualifying
25 period." *See* Docket No. 67 (Mot., at pg. 10). The Government relies heavily on this fact, and cites
26 no other. Noticeably absent, however, is data from other tiers – more specifically, the total number
27 of crab traps allocated to nonresidents, as a class, vis-à-vis residents. It is possible, for instance, that
28 although nonresidents are slightly overrepresented in tier one, they are underrepresented in the other

1 tiers and as a whole, particularly compared to the historic proportion of their catch in California
2 waters in prior years. The latter data may be difficult to obtain. Prior to the current regulations,
3 California placed no limit on the number of crab traps that a vessel could deploy. Thus, counsel for
4 Plaintiffs posited that the best proxy would be to determine the amount of crab caught by residents
5 and nonresidents in pounds, as evidenced by landing receipts – referred to as "poundage" – before
6 and after the new regulations have been implemented. However, the Government has produced no
7 such data for the record.

8 Less precise data in the record suggests, however, that the new regulations have effected
9 some fall-off for nonresidents. The Government's data show that nonresidents, as a class, obtained
10 on average roughly 13.12% of all permits from 2003-2012, obtaining about 14% of all permits in
11 2012. The available data for 2013, the first year of implementation of the current regulations, show
12 that this percentage fell to 12.60%. *See* Docket No. 68-2 (Ex. 1 and 2 to Meckenstock Decl.).[6]
13 While neither party has analyzed whether this change is statistically significant, the record must be
14 viewed in Plaintiffs' favor in the context of this motion for summary judgment. At this juncture, the
15 Government has not negated the evidence of some adverse impact on nonresidents.

16     3.    <u>Protectionist Purpose</u>

17 As noted above, the Court also looks at whether there is a distinct protectionist purpose
18 intended to disadvantage nonresident fishermen. *See McBurney*, 133 S. Ct. at 1715 (noting that "the
19 Court has struck laws down as violating the privilege of pursuing a common calling only when those
20 laws were enacted for the protectionist purpose of burdening out-of-state citizens.").

21 Often, a discriminatory purpose is apparent where the challenged law contains a facial
22 classification. *See e.g.*, *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985) (residency
23 requirement to join the bar); *Hicklin v. Orbeck*, 437 U.S. 518 (1978) (hiring preferences for
24 residents). *See also Toomer v. Witsell*, 334 U.S. 385 (1948) (license fee differential in shrimping

---

[6] Plaintiffs did not oppose Government's request for judicial notice. *See* Docket No. 70 (Dft.'s RJN). The Court accordingly takes judicial notice of the data compiled by the California Department of Fish & Wildlife, attached to motion for summary judgment, as matters of public record that are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b)(2); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 (9th Cir. 2004) (noting that a court "may take judicial notice of a record of a state agency not subject to reasonable dispute").

11

industry). In the case at bar, there is no such facial classification. Accordingly, the question is whether a protectionist purpose may be inferred where the regulation is neutral on its face. While there is little, if any, case law in the privileges-and-immunities context addressing this question, in other arenas, an analytical framework has been developed to ascertain a discriminatory purpose of facially neutral laws. The courts have looked to the magnitude of the disparate impact, as well as other evidence, such as a statute's historical background or its legislative history. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-67 (1977) ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."). *See also Lunding v. New York Tax Appeals Trib.*, 522 U.S. 287, 292 (1998) (notwithstanding a dearth of legislative history, considering ostensible rationale behind challenged tax).

Here, although the record is not developed, the evidence and inferences drawn in Plaintiffs' favor, suggests some discriminatory impact thought perhaps slight. Looking to other indicia of protectionist intent, the history of California's regulation of Dungeness crab, viewed in Plaintiffs' favor on this motion, contains some indicia of protectionism. For example, the legislative history examined in *Marilley* indicates that the California legislature was motivated in part by the need to control competition from out-of-state fishermen when it enacted and later increased licensing fee differentials for Dungeness crab permits. *Marilley*, 2013 WL 5745342, at *4-5. Though this legislative history is not directly on point as to the trap limit program at issue here, it nonetheless provides a historical context in which the current regulations were promulgated. *See e.g.*, *Village of Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.").

The legislative history[7] of the Crab Trap Limit Program contains the following statement:

- "Provide the platform for ongoing work with Crab Fishery stakeholders to craft a Bill that will help conserve the resource,

---

[7] The Government continues to press their argument that "is rarely, if ever, relevant to a Privileges and Immunities Clause claim." *See* Docket No. 67 (Mot., at pg. 15) ("Importantly, courts rarely, if ever, look to purported legislative history in Privileges and Immunities Clause cases.") (citing *McBurney*). The Court rejects this argument for the same reasons articulated by the court in *Marilley*. 2013 WL 5745342, at *18, n. 17.

12

> meet the regulatory requirements of the Department of Fish & Game, keep unneeded gear out of the water, and **put a halt to the annual cross border race for crabs that threatens the livelihoods of our fishermen**." *See* Docket No. 82-1 (Ex. F to Tienson Decl.) (9/2/2011 Senate Bill Analysis re: SB 369, at pg. 7).

- Desire to "protect California's crab fishery from unfair competition from large, **out-of-state boats that are limited in their own states**." *See* Docket No. 82-1 (Ex. D to Tienson Decl.) (8/15/2011 Senate Bill Analysis re: SB 369, at pg. 4).

The Government responds that this is not the primary purpose of the statute. The problem with the Government's response at this juncture is twofold. First, the parties have not briefed the appropriate legal standard: *e.g.* must the protectionist purpose of legislation be the primary purpose, a substantial factor, a motivating factor, etc.? Second, whatever the precise legal test, the actual intent of the legislation at issue remains a disputed factual question, at least at this juncture. the court notes that although legislative purpose is sometimes a question of law when it comes to *e.g.* construing a statute, discerning whether the legislative body was motivated by an illicit purpose is a question fact. *See e.g.*, *Village of Arlington Heights*, 429 U.S. at 268 (finding "legislative or administrative history may be highly relevant" to discern "proof of racially discriminatory intent or purpose").

In the final analysis, the Court finds that based on the current record, a triable issue exists as to whether the Dungeness Crab Trap Limit Program regulations burden Plaintiffs' right to pursue a common calling – commercial fishing of Dungeness crab. Additionally, a triable issue exists as to whether the regulations discriminate in practical effect sufficient to implicate the Privileges and Immunities Clause and as to whether the regulations were promulgated with a protectionist purpose. The Government's motion for summary judgment on Plaintiffs' fourth claim – Privileges and Immunities claim – is accordingly denied.

C.      Eighth Claim:  Magnuson-Stevens Act

In their eighth claim, Plaintiffs seek a declaration that the Dungeness Crab Trap Limit Program regulations conflict with and are preempted by federal law, as embodied by the Magnuson-Stevens Act and the Dungeness Crab Act. *See* Docket No. 34 (FAC, ¶¶ 90-91). Plaintiffs assert the conflict arises because California regulates out-of-state registered vessels in the EEZ and fails to

consider non-California landings in the following circumstances (1) Dungeness crab was caught in either California, Oregon, or Washington's EEZ and landed at "non-California ports"; (2) Dungeness crab was caught in either California, Oregon, or Washington's before the Tri-State E-200 Agreement was effective on January 1, 2007 (*i.e.*, 2003-2006). The Government responds that the regulations are consistent with both federal statutes and thus no preemption lies. *See* Docket No. 67 (Mot., at pg. 22-23).

The Supremacy Clause of the Constitution, Art. VI, cl. 2, invalidates state laws that "interfere with, or are contrary to," federal law. *Nat'l Audubon Socy., Inc. v. Davis*, 307 F.3d 835, 851 (9th Cir. 2002) *opinion amended on denial of reh'g by* 312 F.3d 416 (9th Cir. 2002). Federal preemption is generally disfavored. *Dupnik v. U.S.*, 848 F.2d 1476, 1480 (9th Cir. 1988) ("[A] finding of federal preemption is disfavored: Preemption of state law by federal statute or regulation is not favored in the absence of persuasive reasons-either that the nature of the related subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.") (internal citations and quotations omitted)).

Additionally, there is a presumption against preemption of state laws where, as here, those laws were enacted pursuant to the State's historic police powers. *See P. Merchant Ship. Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011) *cert. denied*, 133 S. Ct. 22 (U.S. 2012), noting that "[e]nvironmental regulation traditionally has been a matter of state authority" (citing *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1255 (9th Cir. 2000)). *See also Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) ("Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions."); *Viva! Int'l Voice For Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal.4th 929, 937 (2007) (noting "wildlife management" is "historically within the traditional police powers of, the states").

"Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Chae v. SLM Corp.,* 593 F.3d 936, 941 (9th Cir. 2010) (citations omitted). The party claiming federal preemption has the burden of proof. *Jimeno v. Mobil Oil Corp.*, 66 F.3d

14

1514, 1526 (9th Cir. 1995) (noting that burden of federal preemption is on party asserting the defense). The current action implicates the second category of preemption – conflict preemption.

Plaintiffs contend that the Dungeness Crab Trap Limit regulations are preempted by portions of the (1) Magnuson-Stevens Act, codified at 16 U.S.C. § 1856(a)(3) (Oct. 11, 1996); and (2) Dungeness Crab Act, codified at P.L. 109-479, § 302(e) (16 U.S.C. § 1856 note) (Jan. 12, 2007). The seminal issue here is whether California's Dungeness Crab Trap Limit Program regulations conflict certain provisions of the Dungeness Crab Act, which is contained within the Magnuson-Stevens Act. As noted above, the Dungeness Crab Act provides in relevant part:

> (a) In General. Subject to the provisions of this section and notwithstanding section 306(a) of the Magnuson–Stevens Fishery Conservation and Management Act (16 U.S.C. § 1856(a)), each of the States of Washington, Oregon, and California *may adopt and enforce State laws and regulations governing fishing and processing in the exclusive economic zone adjacent to that State* in any Dungeness crab (Cancer magister) fishery for which there is no fishery management plan in effect under that Act.
>
> (b) Requirements for State Management. Any law or regulation adopted by a State under this section for a Dungeness crab fishery –
>
> > (1) except as provided in paragraph (2), *shall apply equally* to vessels engaged in the fishery in the exclusive economic zone and vessels engaged in the fishery in the waters of the State, and *without regard to the State that issued the permit under which a vessel is operating*;
>
> (c) Limitation on Enforcement of State Limited Access Systems. Any law of the State of Washington, Oregon, or California that establishes or implements a limited access system for a Dungeness crab fishery *may not be enforced against a vessel that is otherwise legally fishing* in the exclusive economic zone adjacent to that State *and that is not registered under the laws of that State*, except a law regulating landings.

P.L. 104–297 (16 U.S.C. 1856 note) (Oct. 11, 1996) (emphasis added). Under the Dungeness Crab Act, California is permitted to regulate any vessels operating in its adjoining EEZ, subject to certain restrictions: (1) California's laws and regulations must apply equally both within and without its borders; (2) California must regulate "without regard to the State that issued the permit"; and (3) laws establishing or implementing a limited access system may not be enforced against an out-of-state registered vessel otherwise legally fishing in the EEZ.

15

1 Plaintiffs' preemption argument boils down to two provisions of the Dungeness Crab Act, subdivisions (b)(1) and (c). First, Plaintiffs contend that by considering only California landings, the regulations violate and conflict with the Dungeness Crab Act's requirement under (b)(1) that California act "without regard to the State that issued the permit under which a given vessel is operating." *See* Docket No. 72 (Opp'n, at pg. 24) ("Section 8276.5 fails to treat equally all vessels within State waters and in the EEZ 'without regard to the State that issued the permit under which the vessel is operating' because it clearly penalizes (and therefore, does not treat equally) the Plaintiffs because it was only their Oregon and Washington permits which allowed them to land the crab they caught during the Qualifying Period outside of the State of California."). Second, Plaintiffs contend that California is "enforc[ing]" its regulations against a vessel that is "otherwise legally fishing" in California EEZ waters and not registered under California laws in violation of subdivision (c).

Both arguments fail as a matter of law. Plaintiffs' subdivision (b)(1) argument ("without regard to the State that issued the permit") is foreclosed by *Marble*, which this Court cited approvingly in its order on the Government's motion to dismiss (Docket No. 46). *Marble* held, subdivision (b) of the Dungeness Crab Act only applies to vessels <u>currently</u> operating within its adjacent EEZ:

> By its terms, however, the Dungeness Crab Act only prohibits a state from discriminating against a vessel that *presently* "is operating" in its adjacent EEZ under the authority of an out-of-state permit. Thus, the statute does not apply to state laws that establish the crab-pot limits for a state's *own* permittees. Rather, it merely prevents the states from assigning discriminatory crab-pot allocations to out-of-state vessels permitted to operate in their adjacent EEZ waters.

234 P.3d at 1072 (emphasis in original). Pursuant to the Tri-State E-200 Agreement of 2007 (effective Jan. 1, 2007) and Cal. Fish & Game Code § 8280.9, the only vessels operating within California EEZ waters are California permittees. As § 8276.5 applies only to California-permitted vessels, it does not impose crab trap tag limitations on Oregon or Washington permitted vessels. It therefore applies "without regard to the State that issued the permit under which a vessel is operating."

Plaintiffs' argument under subdivision (c) similarly fails. Subdivision (c) prohibits California from enforcing its regulations against a vessel that "*is* otherwise legally fishing" in California EEZ waters and that is "not registered under the laws of that State." For the same reasons as discussed above, the California crab trap tag limitations applies only to California permitted vessels – all vessels fishing in California waters and adjacent EEZ are "registered under the laws of that state."

In sum, the California Crab Trap Limit Program does not conflict the Magnuson-Stevens Act or the Dungeness Crab Act. Thus, the Government's motion for summary judgment on Plaintiffs' eighth claim – preemption under the Magnuson-Stevens Act – is granted.

### III. CONCLUSION

Based on the foregoing, the Court rules as follows:

1. The Government's motion for summary judgment as to Plaintiffs' fourth claim – Privileges and Immunities – is **DENIED**.
2. The Government's motion for summary judgment as to Plaintiffs' eighth claim – Magnuson-Stevens Act – is **GRANTED**.

This order disposes of Docket No. 67.

IT IS SO ORDERED.

Dated: December 9, 2013

_____
EDWARD M. CHEN
United States District Judge