UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH AND LYNETTE DAIRY, *et al.*, | No. C-13-1518 EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION AND MOTION FOR SUMMARY JUDGMENT** |
| CHARLTON BONHAM, Director of the California Department of Fish and Wildlife, in his official capacity, | |
| Defendant. | **(Docket No. 98)** |
|_____/ | |

Plaintiffs are six individuals and one limited liability company[1] involved in commercial Dungeness crab fishing, who have sued to invalidate California Fish & Game Code § 8276.5, seeking declaratory and injunctive relief for various alleged federal constitutional violations. The Court issued its order granting in part and denying in part Defendant's motion for summary judgment. Currently before the Court is Defendant's Motion for Reconsideration of that ruling. For the reasons set forth below, Defendant's motion is **GRANTED**.

## I. FACTUAL & PROCEDURAL BACKGROUND

The factual background in this action is set forth more fully in the Court's order granting dismissal of certain of Plaintiffs' claim. *See* Docket No. 46.

---

[1] The only substantive claim that remains after the Court's ruling on Defendant's dispositive motions are claims under the Privileges and Immunity Clause. However, this ruling only impacts individual plaintiffs, who are natural persons, and not Plaintiff F/V Brooke Michelle, a limited liability company, whose privileges-and-immunities claim was dismissed with prejudice. *See* Docket No. 46 (Order, at pg. 21-22).

Plaintiffs filed the current lawsuit against the director of the California Department of Fish and Wildlife ("Defendant"), challenging California Fish & Game Code section 8276.5 (Dungeness Crab Trap Limit Program regulations) on various constitutional grounds. Plaintiffs contend that because § 8276.5, an implementing regulation of the Dungeness Crab Trap Limit Program, as the issuance of California crabbing permits on the historical record of a permitee's catch landed *in California* (and excluding that landed in Oregon or Washington) during the Qualifying Period of 2003-2008, the statute discriminates against nonresident fishermen. The Court granted Defendant's motion to dismiss certain of Plaintiffs' claims: first (Commerce Clause), second (Equal Protection Clause), third (Right to Free Movement), fourth (Privileges and Immunities Clause, as to Plaintiff F/V Brooke Michelle only), fifth (Procedural Due Process), sixth (Bill of Attainder, all plaintiffs), and seventh (Bill of Attainder, as to Plaintiffs Dairy, Speer, and Moore only). *See* Docket No. 21. The Court also denied Plaintiffs' motion for reconsideration of that ruling. Docket No. 92. Defendant moved for summary judgment on the remainder of Plaintiffs' claims: (1) fourth (Privileges and Immunities Clause, as to the remaining plaintiffs); and (2) eighth (Conflict Preemption With Magnuson-Stevens Act). The Court granted in part and denied in part that motion (the "Order"). Docket No. 67.

Defendant moved for leave to file a motion for reconsideration of the Order and filed a substantive motion in support. *See* Docket No. 98. Specifically, Defendant requests that the Court reconsider its ruling denying summary judgment as to Plaintiffs' privileges-and-immunities claim. The Court granted leave to file the motion for reconsideration. Plaintiffs filed an opposition.[2] *See* Docket Nos. 101, 102.

## II. DISCUSSION

A. <u>Standard of Review</u>

A motion for reconsideration is an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters. v. Estate of Bishop,* 229 F.3d 877, 890 (9th Cir. 2000). Thus, "a motion for reconsideration should not be granted, absent

---

[2] Plaintiffs' opposition to the motion for reconsideration was not timely; however, the Court will consider it nonetheless.

1  highly unusual circumstances, unless the district court is presented with newly discovered evidence,
2  committed clear error, or if there is an intervening change in the controlling law." *389 Orange St.*
3  *Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir. 1999). A motion for reconsideration cannot be used
4  to raise arguments or present evidence for the first time when they could reasonably have been
5  raised earlier in the litigation. *Kona Enters.*, 229 F.3d at 890.

6  B.  Privileges-and-Immunities Clause

7  Defendant argues that reconsideration is appropriate here because the Court failed to
8  consider material facts, the emergence of new material facts, and a material difference in the law
9  presented to the Court that was reasonably unknown to Defendant.[3] First, Defendant contends that
10 the Court failed to appreciate that Plaintiffs assert two distinct claims under the Privileges and
11 Immunities Clause – (1) crab caught and landed outside of California; and (2) crab caught in
12 California but landed outside of California – both of which fail as a matter of law. Second,
13 Defendant takes issue with the Court's analysis of discriminatory effects arguing that the Court (a)
14 failed to consider available evidence that purportedly shows no discriminatory effect on
15 nonresidents, and (b) committed clear error by considering an erroneous baseline for assessing total
16 allocation of permits to nonresidents. Third, Defendant contends that the regulations do not infringe
17 on a fundamental privilege because (a) Plaintiffs' allegation of unprofitability is insufficient as a
18 matter of law, and (b) even assuming their allegations were sufficient, they fail to allege the
19 regulations make crabbing unprofitable for <u>all</u> nonresidents (*i.e.*, outside of a "tiny subclass" of
20 nonresidents).[4]

21  1.  Two Distinct Violations

22  Defendant contends that the Court failed to consider that Plaintiffs are asserting two distinct
23 violations of the Privileges and Immunities Clause: (1) crab caught and landed outside of California;

---

[3] Despite identifying this last basis, Defendant has not presented new law and all cases cited in his motion for reconsideration were already cited in his moving papers. In fact, none of the cases cited are from 2013 or 2014, except *McBurney v. Young*, which Defendant already cited.

[4] The Court declines to address this contention as moot in light of the Court's ultimate ruling. However, the Court reiterates a point made earlier: a statute need not effectuate a complete bar to come within the strictures of the Privileges and Immunities Clause. *See* Docket No. 96 (Order re Summary Judgment, at pg. 9).

3

and (2) crab caught in California but landed elsewhere.  Defendant further contends that the first alleged violation cannot possibly be a cognizable privileges-and-immunities claim because it "infringes heavily on state sovereignty."

Defendant's argument has merit.  The Court notes that Plaintiff Currie initially based his privileges-and-immunities claim on Defendant's alleged failure to consider "landings of crab caught off Oregon and Washington and landed outside California ports during the Qualifying Period." Docket No. 34 (FAC ¶¶ 12, 36); Docket No. 76 (Currie Decl., ¶ 6).  However, Plaintiffs waived this claim in their opposition papers.  *See* Docket No. 102 (Opp'n, at pg. 3) ("Rather, Plaintiffs' Privileges and Immunities claim is that § 8276.5(a)(1) violates the Clause by discriminating against residents of states other than California who harvested ***California-caught crab*** by restricting consideration of landings during the November 15, 2003-July 15, 2008 Qualifying Period to ***only California landings***.") (emphasis added).

Moreover, any such claim fails on the merits, as it improperly infringes on state sovereignty. For instance, as Defendant persuasively contends, just as the California State Bar may consider the duration (*i.e.*, four years) of bar membership in sister states when deciding whether nonresidents are allowed to take the "shorter 'Attorneys' Examination rather than the general bar examination," the California legislature has the prerogative to ignore out-of-state landings of Dungeness crab caught outside of California waters.  *See* Docket No. 99-3 (Mot., at pgs. 6-7).  *See Allstate Ins. Co. v. Lavina Hague*, 449 U.S. 302, 334 (1981) (Brennan, J., dissenting) ("Both the Due Process and Full Faith and Credit Clauses ensure that the States do not 'reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.'") (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980)).  Plaintiffs cite no case authority for the proposition that a state, in regulating matters within its boundaries, must give credit for prior activities occurring wholly outside its boundaries in the context such as the one at bar.

2. <u>Discriminatory Effect</u>

Typically, privileges-and-immunities claims involve discrimination against nonresidents which appears on the face of the statute.  *See e.g.*, *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985) (residency requirement to join the bar); *Hicklin v. Orbeck*, 437 U.S. 518 (1978)

4

(hiring preferences for residents); *Toomer v. Witsell*, 334 U.S. 385, 396-97 (1948) (shrimping license tax based on residency); *Marilley v. McCamman*, C-11-02418 DMR, 2011 WL 4595198, at *4-6 (N.D. Cal. Oct. 3, 2011) (crab fishing license fee differential based on residency). However, a facially neutral law may violate the Privileges and Immunities Clause. As this Court previously noted, in *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 67 (2003), the Supreme Court suggested a facially neutral statute may violate the Privileges and Immunities Clause if it is a proxy for differential treatment or discriminates in practical effect against nonresidents.

In *Chalker v. Birmingham & N. W. Ry. Co.*, 249 U.S. 522, 527 (1919), the Court struck down under the Privileges and Immunities Clause a facially neutral statute. There, the law that imposed a classification based on a characteristic that *commonly* distinguishes residents from nonresidents – *i.e.*, the location of an entity's "chief office." The statute at issue would have charged $100 to any person or corporate entity doing business in the state of Tennessee whose "chief office" was located outside the state, whereas those with in-state offices would only be charged $25. The Supreme Court held that such a statute "discriminate[d] in effect" against nonresidents because the "chief office of an individual is **commonly** in the state of which he is a citizen . . ." *Id*. at 527 (emphasis added). In particular, "Tennessee citizens engaged in constructing railroads in that state will *ordinarily* have their chief offices therein, while citizens of other states so engaged will not." *Id.* (emphasis added). Hence, a facially neutral law, such as § 8276.5, may violate the Privileges and Immunities Clause if it has a discriminatory effect which is common or ordinary among nonresidents.

Defendant contends that Plaintiffs have not raised a genuine dispute as to whether § 8276.5 discriminates against nonresidents so as to trigger scrutiny under the Privileges and Immunities Clause. Defendant's contentions are essentially twofold. First, Plaintiffs' privileges-and-immunities claim fails, as a matter of law, because the challenged statute adversely affects only a "tiny fraction" or "subclass" of nonresidents, a conclusion bolstered by a recent admission by Plaintiff Dairy that "very few" nonresidents are impacted by the subject regulations. Second, Defendant contends this Court failed to consider available evidence showing Plaintiffs would be unable to prove

5

discrimination in practical effect and that the Court used an erroneous baseline to infer such discrimination.

After carefully reviewing and reconsidering the record, including newly presented evidence by Defendant, the Court concludes Defendant has carried his burden on summary judgment to show that Plaintiffs have failed to establish a triable issue of fact as to whether the statute at issue has a significantly discriminatory impact upon nonresidents such that it can be deemed to constitute a proxy for differential treatment or discriminates in practical effect against nonresidents.

First, and most persuasive, evidence in the record establishes that "very few" nonresidents are in fact adversely impacted by the new crab trap allocation regime. As previously noted in the Court's prior order, fishermen who catch crab in California and adjacent EEZ waters[5] are required to obtain a permit under California Fish & Game Code section 7891 in order to land crab outside of California. Other fishermen (residents and nonresidents) who land crab in California need only obtain a regular permit. Thus, only those holding § 7891 permits during the Qualifying Period are adversely affected by the challenged statute (since they are the only fishermen who caught crab in California waters and adjacent EEZ but land them outside the state and thus suffered from the alleged deficiency of § 8276.5).[6] The proportion of section 7891 permitholders (who for purposes of

---

[5] Docket No. 46 (Order re Motion to Dismiss, at pg. 17 n. 13).

[6] Plaintiffs have presented no evidence to contradict the conclusion that only section 7891 permitholders are harmed by the California-landings-only rule. Plaintiffs try to rebut this conclusion by arguing that "[a] § 7891 permit is **not** required for commercial fishermen who catch crab in the EEZ off California waters, but land that catch in Oregon, if they are not California-registered vessels." Docket No. 118 (Plaintiffs' Response re Supplemental Briefing, at pg. 2) (bold in original). This is not accurate. Since 1996 (*i.e.*, long before the Qualifying Period), under the Dungeness Crab Act, California has had authority to enforce its laws, including Fish & Game Code § 7891, against all vessels fishing within the EEZ adjacent to its waters. *See* P.L. 104-297, § 112(d) (16 U.S.C. 1658 note) (Oct. 11, 1996). This Court noted this very point in a prior order. *See* Docket No. 96 (Order re Summary Judgment, at pg. 3). The only real limitation to this grant of authority is that California cannot enforce laws and regulations promulgated to effectuate their "limited access system," which is not applicable here. Moreover, under Oregon law starting in 2005, an Oregon crab vessel permit is not valid in California waters and adjacent EEZ. *See* Or. Admin. R. 635-005-0460. Thus, Defendant accurately asserts in his supplemental brief that a section 7891 permit is required for crab caught in California waters and adjacent EEZ and landed in Oregon. None of the authorities cited by Plaintiff hold to the contrary. Notably, the only Plaintiffs with a valid privileges-and-immunity claim, *i.e.*, excluding Currie and F/V Brooke Michelle (for reasons noted above), all aver landing crab outside of California pursuant to their section 7891 permits. *See* Docket No. 46 (FAC, at ¶¶ 9, 10, 13, and 37). Therefore, any fisherman in California's Dungeness crab fishery (which includes the adjacent EEZ) who landed crab outside of California (and are thus

1  this motion are conservatively presumed to all be nonresidents) vis-à-vis nonresident regular
2  permitholders during the Qualifying Period is minuscule. For instance, in 2006, there were only 16
3  section 7891 permitholders, whereas nonresident regular permitholders numbered in excess of 288.
4  *See* Docket No. 68-2 (Ex. 2 to Meckenstock Decl., at pgs. 2, 3). The average proportion of section
5  7891 permitholders vis-à-vis nonresident regular permitholders during the Qualifying Period (2003-
6  2008) is 3.5%.[7] *Id.* Therefore, nearly 97% of all nonresident crab fishermen in California's
7  Dungeness crab fishery landed their catch in California during the Qualifying Period and thus are
8  not adversely affected by the new crab trap allocation regime under § 8276.5. This conclusion is
9  corroborated by an admission made by plaintiff Dairy in a collateral administrative proceeding that
10 "very few" Dungeness crab permitholders also hold a section 7891 permit. *See* Docket No. 99-4
11 (Ex. 11 to Meckenstock Decl.) (Dairy's Administrative Hearing Brief, at pg. 4) (further describing
12 these circumstances as "rare").
13      The rarity of an adverse impact upon nonresidents in this case is entirely unlike the situation
14 in *Chalker* where the adverse effect upon nonresidents was "common" and "ordinary." Borrowing
15 from another context in which discriminatory effect must be discerned, the Court notes that the *de*
16 *minimus* impact here would fall short of showing disparate impact in the analogous context of
17 employment discrimination. *Cf. Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002) (As a "rule of
18 thumb," courts have also considered the so-called "four-fifths rule" suggested by the Equal
19 Employment Opportunity Commission. [internal citation omitted.] Found in the Uniform
20 Guidelines on Employee Selection Procedures, the four-fifths rule states that a selection practice is
21 considered to have a disparate impact if it has a "selection rate for any race, sex, or ethnic group
22 which is less than four-fifths (4/5) (or eighty percent) of the rate of the group with the highest

---

harmed by the California-landings-only rule), and certainly the relevant plaintiffs here, must have done so pursuant to a section 7891 permit. Accordingly, only section 7891 permitholders are adversely harmed by the statute at issue.

[7] This number was calculated by summing, averaging, and taking the ratio of "FISH LANDED OUTSIDE CALIFORNIA PERMIT" over "COMM BOAT REGISTRATION (NR)." The Court may properly consider this evidence as it is already in the record. *See* Docket No. 96 (Order re Summary Judgment, at pg. 11 n. 6) (granting judicial notice to certain publically available data).

1  rate."). Here, as noted above, roughly 97% of nonresidents are not affected by the challenged

2  statute, far above the 80% benchmark in the employment discrimination context.

3        Second, as another indicator of the lack of discrimination, the overall share of trap

4  allocations held by nonresidents shows little if any significant decline from their share of permits

5  during the 2003-2008 Qualifying Period before the current regime.[8] Nonresidents comprised on

6  average **12.6%** of all permitholders in 2013. The percentage of *total* traps currently allocated to

7  nonresidents is **12.5%**, see Docket No. 99 (Meckenstock Decl. ¶ 16). In comparison, the *average*

8  allocation of permits to nonresidents over the Qualifying Period (2003-2008) was **12.8%**. *See*

9  Docket No. 96 (Order, at pg. 10).[9] The drop off appears insignificant.

10       Moreover, nonresidents comprise **12.5%** of the bottom tiers (Tiers 5-7) and **12.7%** of the top

11 tiers (Tiers 1-4). Docket No. 99 (Meckenstock Decl. ¶ 14) This suggests that nonresidents are fairly

12 distributed as permitholders across all tiers and are not concentrated, *e.g.*, at the bottom tiers. In

13 fact, as Defendant argues, nonresidents have a disproportionate share of Tier 1 permits. *See* Docket

14 No. 67 (Mot., at pg. 4) ("Nonresidents comprise a higher percentage of the top tier than they do of

15 any other tier except for tier four (of which they currently comprise 14.8 percent)."). Importantly,

16 Plaintiffs fail to rebut these statistics and have failed to provide any affirmative evidence

17 demonstrating any material or significantly adverse impact upon nonresidents as a group resulting

18 from the challenged law.

19       To be sure, the proportion of crab traps now allocated to nonresidents to the number of

20 permits allocated during the Qualifying Period is not perfect since under the old system, permits did

---

[8] In this regard, the Court agrees with Defendant that the relevant baseline for comparison purposes is the 2003-2008 Qualifying Period, not 2003-2012 as it previously applied. The reason is Plaintiffs only challenge the exclusion of non-California landings during the Qualifying Period (2003-2008); Plaintiffs do not challenge the length or timing of the Qualifying Period. Given the focus of Plaintiffs' claim, the relevant comparison is between (1) the number of traps that would have been awarded to nonresidents had non-California landings made during that Qualifying Period been included, and (2) the number of traps actually awarded based on California landings during that same period.

[9] Even if viewed historically and landings outside the Qualifying Period were included, this figure changes very little. From 2000 to 2012 (the year before the new regime was implemented), nonresidents comprised **12.4%** of all permitholders. Docket No. 96 (Order re Summary Judgment, at pg. 11).

1  not specify the number of crab traps that could be deployed.  Thus, permits under the old system are
2  only a proxy for the number of traps held by nonresidents.  A comparison of the actual poundage
3  landed by nonresidents, if such data were available, might be a more precise measure of the share of
4  the crab market captured by nonresidents during the Qualifying Period.  Plaintiffs seek discovery
5  relative to poundage records held by California agencies.

However, while it appears that some poundage information is available from Oregon and California, it is of limited probative value in assessing the quantity and proportion of the California catch that was landed in Oregon by nonresidents.  Evidence in the record suggests that Oregon landings of California-caught crab as recorded by the State of Oregon is likely overstated because of the manner in which Dungeness crab fishermen in Oregon are instructed to report landings on Oregon "fish tickets."  Specifically, an Oregon landing may designate the crab as caught in California waters if the majority of the catch was caught in California.  *See* Docket No. 117-4 (Ex. A to Meckenstock Decl.) (Oregon fish ticket instruction states "Do not report multiple areas, just the area where the majority of crab is caught.") (underlining in original).  As Defendant points out, "if fifty-one percent of a fisherman's catch was from California or California's adjacent EEZ and forty-nine percent of the catch was from Oregon or its adjacent EEZ, the *entire catch* would be identified as coming from California or California's adjacent EEZ."  Docket No. 117 (Defendant's Response to Supplemental Briefing, at pg. 8) (emphasis added).  There is no way to determine what portion of mixed catches was actually from California waters.

Moreover, even these imprecise numbers indicates that landings of California Dungeness crab in Oregon represents at best only a small percentage of crab caught in Northern California waters.  For example, in the years 2003-2008, only **2,048,985** pounds of California Dungeness crab (designated as being caught in California waters) was landed in Oregon, see Docket No. 119 (Ex. C to Hurtado Affidavit) (referred to as "Crab-60"),[10] as compared to **75,340,459** and **103,686,457** pounds of California Dungeness crabs landed in Northern California (Eureka and Fort Bragg) and all

---

[10] Ms. Hurtado of Oregon's Department of Fish & Wildlife averred that "Area 60" corresponds to all of California.  *See id*. (Hurtado Affidavit, at ¶ 4) ("Area 60 refers to all crab caught in California state waters or in the EEZ off of California.").

9

of California, respectively.[11]  Thus, Oregon landings of California Dungeness crab amounts to only **2.65%** of all catches from Northern California.  In reality, because of the mixed catch issue noted above, even that percentage likely overstates the Oregon figure.

Accordingly, even though there remains a discovery dispute over Plaintiffs' access to records retained by *California's* Department of Fish & Wildlife, this is not a reason to preclude a ruling on Defendant's motion for summary judgment.  Given the limited value of available data from Oregon on landings made by nonresident fishermen of crab caught in California and the EEZ, and the statistics discussed herein, any additional data from California sought by Plaintiffs will not have a material effect upon the Privileges and Immunities Clause claim at issue.  Deferral of a ruling on the motion for summary judgment is thus not warranted under Rule 50(d).

### III.  CONCLUSION

For the reasons stated above, upon reconsideration and review of the expanded record, the Court finds that Plaintiffs have failed to establish a genuine issue of fact as to the discriminatory effect of the challenged law upon nonresident crab fishermen as a group.  In particular, Plaintiffs fail to present evidence that the challenged law serves as a proxy for differential treatment or discriminates in practical effect against nonresidents.

///
///
///
///
///

---

[11] These figures were calculated using landings data over the Qualifying Period (2003-2008) compiled by California's Department of Fish & Wildlife.  Defendant asked this Court to take judicial notice of the same data but from 2009.  *See* Docket No. 100 (requesting the Court take judicial notice of Table 15 – 2009 California Commercial Landings Report).  As Plaintiffs did not oppose, this Court grants this request and takes judicial notice of analogous data from years 2003 to 2008.  *See* Fed. R. Evid. 201(b)(2); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 (9th Cir. 2004) (noting that a court "may take judicial notice of a record of a state agency not subject to reasonable dispute").

This landings data can be found at http://www.dfg.ca.gov/marine/fishing.asp (date accessed: March 7, 2014).

Thus, the undisputed facts establish showing the statute at issue does not discriminate against nonresidents sufficiently to trigger scrutiny under the Privileges and Immunities Clause under *Hillside Dairy* and *Chalker*. Accordingly, Defendant's motion for reconsideration and motion for summary judgment on Plaintiffs' claim under the Privileges and Immunities Clause is **GRANTED**.

This order disposes of Docket No. 98. Judgment shall be entered in Defendant's favor.

IT IS SO ORDERED.

Dated: March 7, 2014

_____
EDWARD M. CHEN
United States District Judge